324 P.2d 388

**Lloyd F. BARRON and Veronica H. Barron, Plaintiffs, Cross-Defendants and Respondents,**

v.

**David J. KOENIG and Rebecca Koenig, Defendants, Cross-Complainants, Cross-Defendants and Appellants (Von A. Robbins and Mary A. Robbins, Defendants, Cross-Complainants, and Cross-Defendants).**

No. 8578.

Supreme Court of Idaho.

April 17, 1958.

Rayborn & Rayborn, Lloyd J. Webb, Blandford & Blandford, Lawrence B. Quinn, Twin Falls, for appellants.

Branch Bird, Gooding, Charles Scoggin, Fairfield, for respondents.

TAYLOR, Justice.

██ February 1, 1953, the parties entered into the following agreement:

"This agreement, Made and entered into this 1st day of February, 1953, by and between David J. Koenig and Rebecca Koenig, husband and wife, hereinafter referred to as the parties of the first part, and Lloyd F. Barron and Veronica H. Barron, husband and wife, and Von A. Robbins and Mary A. Robbins, husband and wife, hereinafter referred to as the parties of the second part.

"Witnesseth: That for and in consideration of the covenants and agreements herein contained the parties have and do agree as follows:

"I.

"That the parties of the first part are the owners of 160 acres of farm land in Twin Falls County, Idaho, described as follows, to-wit:

"Southwest Quarter of Section 20, Twp. 10 South, Range 19, East of the Boise Meridian; and the parties of the second part are the owners of a herd of registered Aberdeen-Angus cattle, and that the hereto attached Exhibit A contains the name and registration number of each individual animal, and the total reasonable value of the said herd is the sum of $160,000.00; and the reasonable value of the real estate belonging to the parties of the first part is the sum of $120,000.00.

"II.

"That the parties hereto desire to engage in a joint operation on the following basis and conditions:

"A. That the profits or losses of the operation shall be shared on a basis of one-third to the parties of the first part and two-thirds to the parties of the second part.

"B. That the parties of the first part are to furnish the land above described, together with improvements, and to maintain said land and improvements, and to bear the upkeep on the said real property, and parties of the first part are to furnish necessary machinery and equipment to properly operate said farm.

"C. That the parties of the second part are to furnish the cattle heretofore referred to in Exhibit A.

"D. That all the expenses of operating the business and including the ordinary expense of operating the farm and caring for the cattle shall be treated as operating expenses chargeable to the operating expense of the business.

"E. It is agreed and understood that the herd of cattle shall be kept up and cared for in a manner as is required of a herd of high grade registered cattle. And it is understood by the parties that this herd is recognized as one of the best herds in the intermountain country, and that the care required and the attention to be given to the said cattle by the parties will be the greatest of care, and the parties of the second part being experienced in the handling of registered cattle are to be the judges of when the stock is to be replaced and as to what changes are to be made in the herd.

"F. That the net income from the operations is to be divided between the parties on the basis of two-thirds to the parties of the second part and one-third to the parties of the first part, or in the event of loss the loss is to be shared on the same basis.

"G. That the said cattle are to be kept on the said premises above described at all times except such times as some of them may be moved for show or other necessary purposes.

"H. This Agreement is to continue for a period of ten years, unless sooner terminated by mutual agreement of the parties.

"I. It is agreed that the parties will hire and appoint a general manager to operate the business as covered and specified in this Agreement, and that he shall keep a proper and adequate set of books and records which will be available to the parties hereto at all times.

"J. That the accounting period shall be the 15th day of December of each year, following the end of the fiscal year, which it is agreed will be from December 1st to December 1st each year.

"K. It is specifically agreed and understood that this is to be a limited venture of the parties and is not to be construed as involving the parties in any general partnership, but is to pertain to the operating venture as covered by this Agreement, and nothing more, and is to in no way involve any other properties or business dealings of the parties hereto.

"L. That upon the termination of this Agreement it is agreed that the parties of the second part are to have no interest in the farm lands or improvements covered by this Agreement, and that the parties of the second part are to have a number of registered cattle equal to the number of cattle that they put into the business, as shown by Exhibit A attached to this Agreement, that is, they are to have cattle equal in quality and number to those put into the business as shown by Exhibit A hereto attached, and any cattle in excess of said number are to be divided between the parties on the basis of two-thirds to the parties of the second part and one-third to the parties of the first part. And, further, if at the time of the termination of this Agreement there should be a smaller number of cattle than as shown by the said Exhibit A to this Agreement, then the parties of the second part would receive from the parties of the first part a sum equal to one-third of the difference in average per head value of the remaining herd.

"M. That proper and accurate books and records of all operations covered by this Agreement are .to be kept by the parties and the expense of the said bookkeeping is, as well as any and all other expense of operation, whether or not herein covered, to be paid by the parties from the general operating expense, or if the business should show a loss then to be shared on the same pro rata basis as heretofore mentioned in this Agreement.

"N. It is further agreed and understood between the parties that on any and all business undertakings of a major nature pertaining to the operation of this joint venture, the parties hereto will confer with each other.

"The parties hereto respect*fully* bind themselves, their heirs and legal representatives by this Agreement.

/s/ "David J. Koenig
/s/ "Rebe*ca* Koenig
"Parties of the First Part.
/s/ "Lloyd F. Barron
/s/ "Veronica H. Barron
/s/ "Von A. Robbins
/s/ "Mary A. Robbins
"Parties of the Second Part."

Whether the legal entity created by the agreement is a joint venture or limited partnership is of no importance here. See 48 C.J.S. Joint Adventures § 1 b (6), p. 806. The rights, duties and liabilities of the

parties are determined by the agreement. Use herein of the terms "venture", "partnership", or "partner", is not intended to extend or limit the agreement, or the rights or obligations of the parties thereunder.

The parties operated under this agreement from its date until some time in October, 1954. Dissatisfaction and disagreements arose early in 1954 and in May and June of that year negotiations were had between the partners in an effort to agree upon a dissolution. All agreed to dissolve the partnership, but there being no partnership funds for the payment of outstanding debts and no assets which could be sold advantageously at that time to raise money for that purpose, it was agreed that final dissolution would await the annual fall sale of cattle later held October 11, 1954.

The proceeds of the October, 1954, sale were insufficient to pay the outstanding debts of the partnership and negotiations continued. An accounting firm was employed by the partners, and a preliminary report was made by the auditor under date of January 3, 1955. The auditor conferred with the partners as to the proposed division of cattle between Barron and Robbins, also as to the division of other capital assets, and as to approval or rejection of specific items in the financial transactions of the partnership concerning which there was or might be disagreement. A second report was then prepared by the auditor and submitted under date of January 21, 1955. From this it appeared there was a net loss resulting from the partnership operations of $15,964.29. After adjusting the capital account of the respective partners, charging and crediting as required by the agreed division of capital assets and other items, the auditor reported the amount of the contribution which each of the three groups of partners should make to a fund for the payment of the deficit.

Koenig refused to pay the portion allocated to him. Robbins claimed he had been relieved of the obligation by an agreement reached in June, 1954. Barron was willing to pay his share of the loss according to the contract. The cattle were actually divided between Barron and Robbins. Koenig indicated that any division of the cattle which Barron and Robbins agreed upon was satisfactory to him. His only stated objection was that the cattle should not be disposed of or released until the debts were paid. Additional obligations of the partnership were presented and recognized subsequent to the auditor's reports.

This action was commenced by plaintiffs (respondents) Barron and wife against defendants (appellants) Koenig and wife and defendants Robbins and wife, May 18, 1955, to secure a dissolution of the partnership, for the liquidation and application of its assets to the payment of its debts, and for an accounting, and that the respective partners be required to contribute

individually to the payment of the remaining obligations of the venture.

Robbins and wife answered, denying liability and setting up the alleged agreement of June, 1954, as a discharge of any liability on their part. The court found against them on this contention, and they have not appealed.

The defendants Koenig denied that Barron and Robbins had furnished or put 205 head of cattle into the venture as agreed. In a cross-complaint they alleged that they had been induced to enter into the contract by fraud on the part of Barron and Robbins, and that after the execution of the contract, Barron and Robbins had fraudulently concealed the financial affairs and operations of the partnership, in breach of trust, and had failed to attach "Exhibit A" to the contract, and had failed to keep books and records as required by the agreement.

By order of December 8, 1955, the court appointed J. Robert Tullis, a certified public accountant, as a referee to examine the affairs and audit the books and records of the partnership and to report to the court thereon. Mr. Tullis was a member of the accounting firm previously employed by the parties and is the one who made the reports to the parties dated January 3 and January 21, 1955. The reference was special and limited to the purposes stated by the court. The referee's report to the court was made under date of February 17, 1956. After allowing certain debits and credits to the three groups of partners arising out of the distribution of capital assets and other minor items, the report of the referee showed the amount of the contributions required by the partners to meet outstanding debts to be as follows: Robbins and wife, $7,114.87; Barron and wife, $6,925.73; Koenig and wife, $8,340.30. The report also contains a list of the cattle furnished to the enterprise by Barron and Robbins, as well as the sales and other dispositions of cattle during the operations of the partnership, and the lists of the animals as divided between Barron and Robbins.

The cause was thereafter tried to the court sitting without a jury. After an extended trial and voluminous testimony the trial court entered its decree dissolving the "partnership or joint enterprise". The court found certain additions to the obligations of the venture, determined that the losses should be borne equally by the individual partners, and "after taking into account the advancements and contributions made to the venture by the respective individuals personally said individuals are obligated to pay the following amounts in order that the obligations of the venture shall be borne equally by the three partners, to wit: Lloyd F. Barron, $7831.61; David J. Koenig, $9460.55; Von A. Robbins, $8242.42; together with interest on the

sum of $22,150.00 thereof at the rate of 5½% per annum from February 14, 1957". The judgment also impressed liens upon the respective properties of the individual partners, which had been furnished to the venture, as security for the payment of the individual liability of each, as determined by the decree.

The defendants Koenig and wife appealed. Their first assignment of error is as follows:

"The court erred in finding that no fraud, either actual or constructive, was employed by the respondents upon the appellants to obtain the agreement of February 1, 1953, and in refusing to declare the agreement null and void because of fraud in its inception."

In brief, the fraud alleged is that Barron and wife represented to appellants that they were the owners of a valuable herd of registered Aberdeen-Angus cattle and that they had become associated with one Von A. Robbins, who was experienced in the operation of registered Aberdeen-Angus cattle and a man who was honest and trustworthy, and that if appellants would place the farm described in the contract at their disposal and would build certain additional buildings thereon, Barron and wife and Robbins and wife would enter into a joint venture agreement with appellants; that Barron and Robbins represented their herd of registered Aberdeen-Angus cattle was of the value of $160,000,

and that the operation thereof would return a net profit of $10,000 per year to appellants; that Mrs. Barron is a niece of appellants and that, because of the family relationship and long personal acquaintance with Lloyd Barron, and their confidence in him, they believed that Barron and Robbins were men of great experience in the handling of registered Aberdeen-Angus cattle and were induced by the representations made by them to enter into the agreement of February 1, 1953; that the representations were not true and were known by Barron and Robbins to be untrue; that the herd of cattle contributed to the enterprise by Barron and Robbins was in fact of a value not in excess of $60,000 and could not return the revenue represented.

Pertinent to the alleged fraud and concealment the court found as follows:

"* * * the opinions of Barron and/or Robbins as to the worth and value of the herd of cattle they delivered to the Koenig ranch under such agreement had sufficient support in the past records, profits and history of the herd to support and substantiate their opinions that the herd was worth $160,000.00 as well as the 'thought' of Lloyd F. Barron that the enterprise would succeed, and that the Koenigs would get better than ordinary rent, and the lack of success of the enterprise was due more to other factors, such as declining prices of the cattle,

increased operation expenses and lack of harmony of the operators, and any opinion of Barron and/or Robbins that the value of said herd was $160,000.00 was made in good faith, was not known by either to be false, nor made for the purpose of deceiving the Koenigs or causing them to act to their prejudice; neither Lloyd F. Barron nor Von A. Robbins represented to the Koenigs that said cattle would easily return a net profit of $10,000.00 per year to the Koenigs; and neither Lloyd F. Barron nor Von A. Robbins concealed any or all matters pertaining to the operation of said venture from the Koenigs."

" * * * Barron advised the Koenigs that he thought that the Koenigs would get more than average rent if they put their ranch into the venture."

"That the herd of Barron and Robbins and the land of the Koenigs were both puffed up to some extent in the course of the negotiations had in connection with forming the partnership or joint venture; but Barrons and Robbins did consider and had a right to consider the herd of cattle reasonably worth the sum of $160,000.00 when the venture was being formed, considering their previous experience and especially the results of their 1952 sale; the Koenigs contributed their land to the venture and the Barrons and Robbins contributed their cattle to the venture in accordance with the agreement of February 1, 1953, and the Koenigs constructed the barns and feed lots approximately as provided in the agreement; that with the dissolution of such partnership the land and buildings will be the property of the Koenigs".

"The Koenigs are elderly persons, at the time of the execution of the agreement between the parties February 1, 1953, David J. Koenig was of the age of 80 years or thereabouts and Rebecca Koenig two years younger; that David J. Koenig was in poor health mentally and physically at such time; that the Koenigs were unable to supervise a great many of the activities of the partnership, and accordingly they relied upon their son and agent Harold Koenig, a middle aged man with experience in farming activities and livestock raising, and to some extent experienced in the handling of purebred cattle; that said Harold Koenig was paid a salary of $500.00 per month by the Koenigs and in addition was furnished a home by them."

The evidence shows that Harold Koenig and his wife had been friendly with Barron and his wife for some two or more years prior to the making of the agreement; had visited the Barron ranch in Camas County several times during that period and on

those occasions had observed the Barron and Robbins cattle at the Barron ranch; and Harold had attended the sale held by Barron and Robbins in the fall of 1952, and had observed the cattle sold and the prices received therefor. Harold Koenig was present at the home of his parents during the negotiation of the agreement, and also at the office of Koenigs' attorney where the contract was drawn, during the negotiations there conducted. After the agreement was executed, all of the business connected with the enterprise, so far as the interest of David and Rebecca Koenig was concerned, was handled by Harold Koenig. This was in accord with the original arrangement made by David and Rebecca Koenig. Harold represented them in all transactions with the other partners. His authority in that respect was not repudiated by the elder Koenigs, but was confirmed by Rebecca Koenig in her testimony.

Appellants also contend that Barron and Robbins did not furnish the full 205 head of cattle to the venture. However, the testimony of both Barron and Robbins is to the effect that the full 205 head were delivered to the Koenig farm during the season of 1953, in addition to calves born during the interim. The referee reported 205 or more delivered. There is no direct evidence to the contrary. The court's finding of performance in that respect is sustained.

The testimony of Barron and Robbins is that they in good faith believed the herd to be of the value represented at the time of the negotiations for the contract. The market value of such cattle depreciated during the period of the venture. Appellants direct attention to valuations placed upon the cattle by Barron and Robbins in financial statements made by them subsequent to the agreement. These statements were made to banks from which Barron and Robbins borrowed money to pay in part the expenses of the partnership operation. The first was made to the Twin Falls Bank & Trust Company, February 23, 1953, in which the cattle were valued at $60,560; and the second to the First Security Bank at Hailey, dated January 1, 1954, in which the cattle were valued at $66,580. Barron and Robbins testified they orally gave the banks the valuations which they thought correct and that the valuations entered in the statements were entered at lower figures by the bank officials concerned, for reasons of their own. This testimony was not contradicted. Mr. Eaton, president of the Twin Falls Bank & Trust Company, who did not personally take the statement given that bank, testified merely that the information therein was furnished by Mr. Robbins and Mr. Barron.

The evidence does not support appellants' allegation that respondents represented that appellants would receive a return from the venture of $10,000 a year. The evidence is that Barron told the Koenigs he thought the venture would return them

more than the average rental they had been receiving from the farm.

■ A representation which is an honest expression of opinion, based upon reasonable ground, and which is expressed and understood as nothing more than an opinion, cannot be made the basis of actionable fraud. Johnson v. Holderman, 30 Idaho 691, 167 P. 1030; Smith v. Johnson, 47 Idaho 468, 276 P. 320; Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345; 37 C.J.S. Fraud § 57, p. 334. Misrepresentations as to future income and profits are usually held to be non-actionable expressions of opinion. 37 C.J.S. Fraud § 54, p. 320.

Countervailing the alleged misrepresentation of the value of the cattle, there was testimony that appellants' farm was worth only $82,300 at the time the contract was negotiated.

■ Fraud is never presumed. All of the essential elements thereof must be established by the party relying thereon by clear and convincing evidence, especially where the integrity of a written instrument is assailed. Smith v. Johnson, supra; Nelson v. Hoff, supra; Cooper v. Wesco Builders, 76 Idaho 278, 281 P.2d 669; Petersen v. Holland, 79 Idaho 63, 310 P.2d 810. The finding of the trial court that the execution of the contract by appellants was not induced by fraud is supported by the record.

■ Although not brought before us by an assignment of error, the appellants urge that Barron and Robbins breached the contract in that they failed to attach thereto a list of the cattle furnished by them; that defendant Robbins, having been appointed general manager pursuant to sub-paragraph I. of the agreement, did not keep a proper and adequate set of books and records as therein required; and that Barron and Robbins, during the course of the operation, concealed the financial affairs of the partnership, failed to make any accounting to them, and represented that the operation was succeeding satisfactorily. The only records kept by Robbins were a "bank register", in which a record of checks drawn on the partnership account was kept, and loose deposit slips. Apparently no records were kept of outstanding accounts receivable or payable. Robbins did not comply with his duty in that respect. The books and records kept by him did not reflect the true state of the affairs of the venture.

The trial court found that appellants did not request an accounting until the fall of 1954. While accurate books and accounts were not kept as required by the contract, there is no evidence of any actual concealment of the operations or financial status of the firm. All of the income of the partnership as well as all the moneys borrowed were paid into the partnership bank account and all expenditures made and all

debts incurred were for·the benefit of the partnership and in the ordinary course of its operation. The auditor-referee testified that no item of debit or credit was entered in his audit concerning which there was or might be any disagreement until such item had been discussed with the partners at one or more of the several conferences held by them with the auditor for that purpose; and that all of the entries in the audit were either expressly or by acquiescence approved at such conferences. Harold Koenig attended these conferences and represented appellants in the negotiations and settlements had thereat.

The evidence does not show that either Barron or Robbins profited from any breach of duty or alleged concealment. Excluding sucking calves, which were not counted either in the original 205 nor in the final number divided between them, Barron and Robbins were returned approximately the same number of cattle they committed to the venture. Those received back were of less value than the original herd, not only because of a decline in market value—not chargeable to the venture—but because a greater percentage were younger, less mature animals.

■ Moreover, there is no evidence of damage to appellants arising out of, or traceable to, the failure of either Barron or Robbins to perform the contract in the respects alleged, nor by reason of alleged concealment. Assuming the wrongs were established there could be no recovery with·out a showing of resultant injury. 25 C.J.S. Damages § 3; 30 C.J.S. Equity § 13; Painter v. Hines, 86 Kan. 832, 122 P. 1036.

■ Appellants assign error of the court in determining that the indebtedness represented by notes payable to the First Security Bank of Idaho at Hailey was the joint and several obligation of the parties and should be paid on an equal basis by each. It appears from the record that prior to the formation of this venture the Barrons and Robbins were partners in the ownership and operation of the herd of registered Aberdeen-Angus cattle and had been operating the business at the Barron ranch in Camas County under the firm name of Sun Valley & Var-Mar. After the formation of the venture here involved, by agreement of the parties, the business was conducted at the appellants' farm in Twin Falls County under the same firm name. On or about February 23, 1953, Barron and Robbins borrowed money for operating expenses of the venture from Twin Falls Bank & Trust Company at Twin Falls. The money was borrowed on the credit of the two partners, Barron and Robbins, upon the financial statement before-mentioned, and upon the representation to the bank that they were leasing 160 acres in Twin Falls County from appellants for a rental of one-third of the net profits of Sun Valley & Var-Mar. After

the first year's operation the indebtedness at the Twin Falls bank was paid off and the account of the venture was moved to First Security Bank of Idaho at Hailey in January, 1954. Money was borrowed from the bank at Hailey for the 1954 operations, likewise upon the credit of Barron and Robbins and on the financial statement given to the bank, hereinbefore mentioned. Barron and Robbins also represented to the Hailey bank that they were leasing 160 acres from appellants for a rental of one-third of the "net profit. Plus taxes, water, etc."

Appellants cite authority for their contention that a partnership is not liable for money borrowed by a partner solely on his own credit. See 68 C.J.S. Partnership § 146; 40 Am.Jur., Partnership, § 160. Here, however, the borrowing was done in the name of Sun Valley & Var-Mar, the name in which the parties, including the appellants, had agreed the business would be conducted. Also, the borrowing was done by Von A. Robbins in conjunction with Barron. Robbins had been appointed by the parties, including appellants, as the "general manager to operate the business as covered and specified in this Agreement." (Contract, subparagraph I.) These facts would tend to obligate all members of the partnership or joint venture. 68 C.J.S. Partnership §§ 141, 147. However, we think that question is not before us. The authorities cited by appellants deal with the right of the creditor to recover from the partnership or the members thereof who had not participated in the borrowing. Here the bank is not a party and its right to collect from appellants is not in issue. We are concerned only with the right of these parties, inter sese. The money borrowed was all used in defraying operating expenses of the partnership. Appellants' representative, Harold Koenig, testified he knew all along that money was being borrowed to pay operating expenses. He knew of the borrowing at the Twin Falls bank; he knew of the transfer of the account to the Hailey bank, and that money was borrowed there. The foregoing facts are sufficient to establish a liability on the part of appellants, as between the partners, to pay their share of the loss represented by the indebtedness to the bank at Hailey, pursuant to the terms of the agreement. If Barron or Robbins, or both of them, were required by the bank to pay the obligation in full, they could enforce contribution against appellants under the contract and decree herein. Smith v. Burt, 150 Okl. 34, 300 P. 748; Buzianis v. Buzianis, 81 Utah 1, 16 P.2d 413; Schmidt v. Nash, 203 Okl. 21, 217 P.2d 830; Rudnick v. Delfino, 140 Cal.App.2d 260, 294 P.2d 983; 48 C.J.S. Joint Adventures § 10, p. 836; 68 C.J.S. Partnership § 445 a; 30 Am.Jur., Joint Adventures, § 45, p. 971; 40 Am.Jur., Partnership, § 330. See also Smith v. Stock Yards

Loan Co., 186 Okl. 152, 96 P.2d 55; Ravold v. Fred Beers, Inc., 151 Misc. 628, 270 N.Y. S. 894.

◼ Appellants also contend that the court erred in determining that the partnership continued until dissolved by the judgment entered. We find no merit in this contention. No authorities are cited which would justify a distinction between the relationship created by the agreement involved and that of an ordinary partnership with respect to premature dissolution. Even if the partnership had been dissolved in fact, by any breach on the part of Barron or Robbins, the relationship continues until the affairs of the firm are wound up. § 53–330, I.C.; Vangel v. Vangel, 116 Cal. App.2d 615, 254 P.2d 919; Sausser v. Barrack, 123 Cal.App.2d Supp. 948, 266 P.2d 231.

◼ Appellants also assign as error the refusal of the trial court to credit them with a share of the value of the good will generated by the advertising of the cattle published at the expense of the enterprise. Where good will is established by a business, and passes to a purchaser, or on dissolution to a survivor or partner continuing the business, it is generally regarded as an asset, the value of which should be shared or distributed, as other assets. 68 C.J.S. Partnership § 437. Here there was no evidence offered to fix the value of the alleged good will. 40 Am.Jur., Partnership, § 351. Only the expense of advertising and showing of the cattle was produced in evidence. This, standing alone, is not determinative of the value of any good will generated thereby.

"Good will is generally understood to mean the advantage that accrues to a business on account of its name, location and reputation, which tends to enable it to retain the patronage of its old customers." Murray v. Bateman, 315 Mass. 113, 51 N.E.2d 954, at page 955.

Here the name of the business was destroyed by the breaking up of the partnership and the division of the herd of cattle between Barron and Robbins. The location of the business at the Koenig ranch was likewise destroyed—part of the cattle were moved to the Barron ranch in Camas County, and part to Robbins' ranch at King Hill. The cost of the advertising was, in part at least, offset by $3,000 received as prizes or premiums at cattle shows, and resultant presumptive increased prices at the annual sales. The trial court, therefore, was correct in refusing to credit appellants with any sum on account of alleged good will.

◼ Appellants assign as error the refusal of the court to allow them a credit for the reasonable rental value of the farm furnished to the venture by them. Any such allowance would have been violative of the contract. By that instrument they agreed to and did furnish to the venture

the use of their farm with its improvements. This, together with the upkeep, was their contribution to the venture. By the terms of the contract their return was to be a share in the profits. There being no profits, there was nothing due them for the use of the land.

Appellants also contend that the court erred in granting a personal judgment to respondent Barron before the assets had been distributed and the debts paid. We do not understand the judgment to be of that nature. Rather the court by its decree has settled the accounts of the parties, determined the outstanding and unpaid obligations of the firm, and adjudged the personal liability of the individual members for their respective shares thereof. Personal judgment in favor of one as against another, for outstanding obligations to third persons which remain unpaid, would have been improper. Hooper v. Barranti, 81 Cal.App.2d 570, 184 P.2d 688. It is only where a member has paid or otherwise relieved the firm from the obligation of a debt that he is entitled to a judgment for contribution against other members.

"The decree should provide for a final adjustment of all controverted questions before the court with respect to partnership accounting and distribution. It should provide for the payment of the firm debts and a final distribution of all the assets and effects · of the firm, and should fix the rights and liabilities of the partners as among themselves." 68 C.J.S. Partnership § 445 c, p. 998.

That is the character of the judgment entered in this case.

Finally, appellants assign as error the imposition of a lien upon their farm to secure the payment of the share of the debts charged to them. The farm land itself was not contributed to the venture by appellants. They contributed only the use of the land and improvements, and its upkeep. Except for operating losses, that was the extent of their risk in the venture. Their land never became an asset of the partnership or joint venture and hence could not be made primarily liable for its debts. Moreover, the judgment, so far as the lien is concerned, is uncertain and indefinite. It does not appear in whose favor the lien was given, nor by whom or under what circumstances it might be foreclosed. We think the court was in error in imposing the lien.

The judgment of the trial court is modified by striking therefrom the portion thereof imposing a lien upon the farm property of the appellants, and for the foreclosure thereof. In all other respects the judgment is affirmed.

Costs to respondents Barron.

KEETON, C. J., and PORTER, SMITH and McQUADE, JJ., concur.