373 P.2d 559

**Earl E. WALKER and Noma Walker, Husband and Wife, Plaintiffs-Appellants,**

v.

**Larry F. NUNNENKAMP and Verda S. Nunnenkamp, Husband and Wife, Defendants-Respondents.**

No. 8951.

Supreme Court of Idaho.

March 1, 1962.

Rehearing Denied April 5, 1962.

Petition for Recall of Remittitur Denied

July 31, 1962.

Rayborn, Rayborn & Webb, Twin Falls, for appellants.

Frank Rettig, Jerome, for respondents.

McQUADE, Justice.

This action was brought by the appellants to set aside a written contract for the sale of realty, and a counterclaim was interposed by respondents asking foreclosure of a contract for sale of realty. This latter claim may be more aptly referred to as one for specific performance.

Respondents were the owners of a motel known as the Rancho Thunderbird, situated in the Village of Ketchum, Blaine County, Idaho. The real property had improvements located thereon consisting generally of cafe, bar, lounge, motel, and living quarters. The property will be referred to generally as the Thunderbird Motel. The Village of Ketchum is adjacent to the world-famous Sun Valley ski resort. The record suggests that motel patronage in wintertime for that area is to a large extent dependent upon skiers, and furthermore that the greatest volume of occupancy is during the skiing season.

About December seventh, 1958, appellants visited the motel properties. On this and subsequent occasions appellant Earl E. Walker inspected the premises, looked at the bookkeeping records of respondents, observed another motel nearby, noted the advancing construction of a new motel, talked with a former owner of the Thunderbird, and visited with other persons who appellant Earl Walker anticipated would

shed light upon the earning potential of the Thunderbird Motel properties.

After their negotiations, the parties entered into a written contract whereby Walkers agreed to purchase the motel for $48,350. Walkers paid $2,500 cash and transferred a farm having an agreed value of $23,500. Remainder of the purchase price, to wit, $22,350, was to be discharged by $200 monthly payments. Interest at six per cent was to be credited first, and the remainder applied to the unpaid balance. Appellants went into possession December 26, 1958. Payments totaling $964 were made on the property. Respondents paid insurance, $252.94, and taxes, $629.77.

Appellants seek cancellation of the contract of sale on the principal ground that fraud had been perpetrated by representation that the motel property had produced a gross income from $9,000 to $12,000 per year. The trial court found no fraud and that respondents were entitled to specific performance as a matter of law because appellants were in default under the contract. Judgment was entered accordingly.

Walker inspected the premises on his first visit, and talked with the Nunnenkamps about the motel business in general. At that time Walker contends Nunnenkamp stated the gross income of the motel was never less than $9,000 annually, and that operating expenses were in the approximate sum of $3,800 per year.

Because of the "Quonset construction" Walker queried the Nunnenkamps as to how the Thunderbird competed with the other motels for trade. At that time Mrs. Nunnenkamp advised Walker

" * * * 'It fills right up with them; when there is any business in town, it gets its share.' "

The Nunnenkamps deny the asserted representation as to income, and counter by the fact that Walker had inspected the books relating to the motel's income and expenses. Walker admits his inspection of the books, but complains that a different set of books was shown to him, other than those produced by the Nunnenkamps on the trial.

Respondents offered a different version of the transaction. They testified books which were shown to Walker were the only records of which they were possessed. They also made a showing that January and February of 1959 constituted the poorest skiing season which had been experienced in that area. This is asserted to have had an adverse effect upon the income of the Thunderbird Motel, which grossed $4,264.35 between January 1, 1959, and September 15, 1959. They also assert that Walker was skeptical about the "Quonset construction" appearance as it related to production of business, and in that regard he made certain plans for alteration of the buildings. Another factor to which Nunnenkamps

point relative to lower income of the motel is inexperience of Walker's son, who was placed in control of the property's management. He was without prior experience in motel management, and spent considerable time away from the property in an attempt to produce additional business.

Appellants contend that a reservation list was not as represented by respondents. The reservation list was of people who had made advance arrangements to stay at the motel while skiing at nearby facilities. Respondents explain that persons on the list failed to fulfill their reservation requests because there was a lack of snow during the skiing season.

Appellants urge cancellation of the agreement misrepresented that the Thunderbird ents for an additional reason that respond-Motel secured its fair share of business available in the area. Walker contended that such representation was untrue because people would drive up to the motel and continue on their way after observing the premises. This would be true even though many of the other motels were filled to capacity. Walker testified that the "Quonset construction" appearance of the improvements reacted adversely to the potential motel trade.

Appellants urged the trial court to set aside and cancel the contract because of these alleged fraudulent misrepresentations. After hearing the evidence, and in view of all the evidence introduced, the trial court concluded that no fraud had been perpetrated upon appellants by respondents, and entered judgment for foreclosure of the contract.

Appellants assign as error the many findings of facts and conclusions of law of the trial court. They also assign as error that the trial court's judgment constituted a forfeiture of all sums paid, although the amount paid was beyond all reasonable relation to any damages sustained by the respondents.

To establish the allegation of fraud, a party must prove by a preponderance of the evidence all of the elements which are inherently contained in such allegation.

"* * * Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury. * * *" 37 C.J.S. Fraud § 3, pp. 215–216.

See also 23 Am.Jur., Fraud and Deceit, sec. 20, p. 773.

The elements of fraud set forth in the above C.J.S. quotation were substantially approved and followed by this Court in Weitzel v. Jukich, 73 Idaho 301, 251 P.2d 542, wherein this Court said:

"Elements of fraud generally consist of a representation or statement of a past or existing fact which is material, which is untrue; the speaker's knowledge of its falsity or ignorance of its truth; his intention that it should be acted on by the person to whom it is made; ignorance of its falsity on the part of the person to whom it is made and reliance on the representation; his right to rely upon it; his damage occasioned thereby. * * *"

A party alleging fraud has the burden of proof. All elements of such allegation must be established by clear and convincing evidence. Barron v. Koenig, 80 Idaho 28, 324 P.2d 388; Scogings v. Love, 79 Idaho 179, 312 P.2d 570; Cooper v. Wesco Builders, 76 Idaho 278, 281 P.2d 669.

Appellant Walker inspected the property himself, talked with a former owner, discussed the motel potential with another motel operator in the Ketchum area, made a cursory examination of the books, and indicated through his proposed future plans that some changes were necessary to improve the business potential.

Lack of snow in January and February resulted in very little business for any of the motels in that area. Another important factor in the successful operation of the business is the operator himself. In this instance, the operator was inexperienced in this type of business, and although he may have made a determined effort, nevertheless there were competent witnesses who testified that in their opinion the operation carried on was not conducive to a successful business.

Appellants rely largely upon their allegation that the respondents misrepresented past income of the motel. Respondents testified the representations were made in accordance with the books introduced on the trial. There was also independent evidence of the parties in this regard. The trial court concluded that respondents did not make such misrepresentations.

An analysis of the evidence leads to the conclusion that appellants had made a comparatively thorough evaluation of the property and its potential before entering into the contract. It appears that appellants were relying upon their own investigation of the property regarding its worth. This also was the finding of the trial court, which we sustain.

Where a party relies upon his own investigation or judgment as to the value of property, he is not entitled to relief upon

the ground of false representations. Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345; Smith v. Johnson, 47 Idaho 468, 276 P. 320; Breshears v. Callender, 23 Idaho 348, 131 P. 15; Petersen v. Holland, 79 Idaho 63, 310 P.2d 810.

It does not appear that appellants were induced to forebear inquiry, but were furnished all of the information which was requested. See Brown v. Bledsoe, 1 Idaho 746.

■ Appellants also assign error on the part of the trial court in that a forfeiture as provided in the judgment of the amounts already paid is an unconscionable penalty. Our rule pertaining to contract provisions for liquidated damages requires that they be in a reasonable relation to the actual damages. If the forfeiture fixed by the contract is arbitrary and bears no reasonable relation to the anticipated damages, and is exorbitant and unconscionable, it is regarded as a penalty, which results in the contractual provision's being void and unenforceable. Graves v. Cupic, 75 Idaho 451, 272 P.2d 1020.

■ Appellants are asking for an equitable determination of the relation between moneys paid in and damages actually suffered by the respondents. As announced in Howard v. Bar Bell Land & Cattle Co., 81 Idaho 189, 340 P.2d 103, equity will intercede to grant relief in such cases.

In Graves v. Cupic, 75 Idaho 451, 272 P.2d 1020, this Court recognized the established policy of law against the allowance of punitive damages for breach of contract in the absence of fraud, malice, oppression, or other sufficient reason; but it recognized that parties to a contract may agree upon liquidated damages in anticipation of a breach in any case where the circumstances are such that accurate determination of the damages would be difficult or impossible, provided that the liquidated damages fixed by the contract bear a reasonable relation to actual damages, but that if the forfeiture or damages fixed by the contract are arbitrary and bear no reasonable relation to the anticipated damages, and are exorbitant and unconscionable, they are regarded as a "penalty" and the contractual provision therefor is void and unenforceable.

There has been no determination made by the trial court as to rental value of the premises for the period of time appellants held the premises under the contract. Because of the short duration of time which appellants held the property, and in the absence of proof to the contrary, no consideration is given to loss of market value of the premises. On the contrary, there is some evidence on the record of the fact there has been an accretion in the property's value.

The trial court will review the evidence, and may take additional evidence to deter-

mine rental value of the premises for the purpose of making a determination if appellants are entitled to any of the moneys paid under the contract. If the amount paid in is thus disproportionate to the damages sustained by respondents occasioned by appellants' breach of contract, that portion in excess thereof must be returned to appellants by respondents.

Judgment reversed and the cause remanded to the trial court for further proceedings consonant with this opinion.

Costs to appellants.

TAYLOR and KNUDSON, JJ., concur.

SMITH, C. J., and NORRIS, District Judge, dissent.

ON PETITION FOR REHEARING.

McQUADE, Justice.

■ Respondents, in their petition for rehearing assert that Howard v. Bar Bell Land & Cattle Co., 81 Idaho 189, 340 P.2d 103, and Graves v. Cupic, 75 Idaho 451, 272 P.2d 1020, do not apply to an action for strict foreclosure.

The rule that equity will not enforce a penalty is applicable to any action upon a real estate contract where the ultimate result involves the enforcement of the penalty.

ON DENIAL OF PETITION TO RECALL REMITTITUR

McQUADE, Justice.

Respondents seek to recall the remittitur of the Court on six grounds:

■ "I. That the Court inadvertently failed to pass on Respondents' right to strict foreclosure of their contract for the sale of the Thunderbird Motel to Appellants, following Appellants' continued default and attempted rescission of the contract on the grounds of fraud."

Respondents in their counterclaim requested the court to find that it be meet and equitable for the contract to be strictly foreclosed. The trial court did grant a period of 90 days within which appellant could pay the contract balance of $21,816.20, with interest at 6% from April 28, 1959 and sums paid by respondents for taxes and insurance. This balance is in relation to the original sale price of $48,350.00.

Respondents are forceful and adamant in their position that Idaho has recognized the principle of strict foreclosure as recognized at common law. History and nature of strict foreclosure is found in 37 Am.Jur. 31, § 529:

"As has been seen, courts of equity relieved against the harsh rule of law whereby, on default by the mortgagor, the mortgaged estate became vested ab-

solutely in the mortgagee, giving to the former a privilege of redeeming even after his default. This privilege was termed the 'equity of redemption'. The mode for its extinction under the ancient equity practice, which continued in England until about the year 1845, was to file a bill for strict foreclosure whereby a decree was obtained for the payment of the mortgage debt within a short period, to be fixed by the court, in default whereof the mortgagor and all persons claiming under him were barred and foreclosed of all right and equity of redemption, and the estate became the property of the mortgagee in the character of purchaser. The court, except in special cases, refused to decree a compulsory sale against the will of the mortgagor, although it would enlarge the time to redeem, according to the equity arising from circumstances. In case of redemption, a conveyance was directed to be made by the mortgagee. This method of procedure was allowed because as it was uncertain whether the mortgagor or subsequent lienors would ever avail themselves of the equity of redemption, that equity was, while outstanding, a serious impediment to the alienation of the mortgaged property. Therefore, an action would properly lie to compel the parties entitled to this equity to exercise it by paying within a reasonable time the amount of the mortgage debt, or be forever barred or foreclosed of the privilege of redeeming. As thus evolved, the purpose of a strict foreclosure is to extinguish the equitable right of redemption, and the title of a mortgagee after strict foreclosure is that conveyed by the mortgage free and discharged of the condition of defeasance. In this respect, a final decree in strict forelosure proceedings expressly providing that in default of payment, all the right, title, and interest, both legal and equitable, of the defendant shall be vested absolutely and forever unconditionally in the complainant, being in conformity with the practice of some jurisdictions, is sufficient to make a complete transfer of the title, although under the English practice, the title is not completely transferred until a final order, based on proof that the money was not paid according to the terms of the decree, is made. However, there is authority to the effect that unless the mortgaged lands are of sufficient value to satisfy the mortgage debt, a decree of strict foreclosure does not operate to extinguish such debt; and in the event of a suit at law upon the mortgage debt, the value of the property may be ascertained."

37 Am.Jur. 32, § 530 discusses the "Modern Attitude toward Strict Foreclosure":

"The doctrine of strict foreclosure developed in England at a time when real property had, to a great extent, a fixed value; the vastly different conditions in this country, in this respect, led our courts to introduce modifications to the English rules of foreclosure. Generally, in consonance with equity's treatment of a mortgage as essentially a security for the payment of the debt, foreclosure by judicial sale supplanted strict foreclosure as the more equitable mode of effectuating the mutual rights of the mortgagor and mortgagee; and there is at the present time, in the majority of the American states, no strict foreclosure as developed by the English courts—either at law or in equity—by which a mortgagee can be adjudged absolute owner of the mortgaged property. The remedy of the mortgagee is by an action for the sale of the mortgaged premises and an application of the proceeds of such sale to the mortgage debt, and although usually called an action to foreclose, it is totally different in its character and results from a strict foreclosure. The phrase 'foreclosure of a mortgage' has acquired, in general, a different meaning from that which it originally bore under the English practice and the common law imported here from England. In this country, the modern meaning of the term 'foreclosure' denotes an equitable proceeding for the enforcement of a lien against property in satisfaction of a debt. However, in some jurisdictions, strict foreclosure is still an appropriate remedy where, in the special circumstances, it will subserve equity and justice. Thus, the power of strict foreclosure is frequently exercised, and probably never refused, when the interests of both parties manifestly require it, as where the mortgagor is insolvent and the mortgaged premises are not of sufficient value to pay the debt and costs. A strict foreclosure has been said to be a proper course of procedure where the mortgage is in the form of an absolute deed of conveyance, without written defeasance, and the grantee-mortgagee is in possession, although foreclosure by sale is usually deemed to be the remedy better designed to safeguard the essential interests of the parties. The remedy of strict foreclosure is, where not barred by statute and under some circumstances at least, and where equitable, available at the suit of the purchaser at a foreclosure sale, or at the suit of one succeeding to the purchaser's interests, against a junior mortgagee or lien holder who, through inadvertence or mistake, was not made a party to the former foreclosure. Furthermore, it seems that strict foreclosure still obtains as the usual mode in a few states."

The great majority of the cases dealing with this subject relate to mortgages whereas the circumstances of this case relate solely to a contract for sale of real property. An annotation which develops the problem with perception and clarity of understanding of contracts for sale of realty is 77 A.L.R. 270:

"*Mortgage and Executory Contract Contrasted*: The view has been expressed that for all practical purposes the relation of vendor and vendee under an executory contract for the sale of land is that of mortgagor and mortgagee. The vendee is the beneficial owner, with the right of redemption notwithstanding default of payment; while the claim of the vendor is but an ordinary money debt, secured by the contract. Ferguson v. Blood (1907) 82 C.C.A. 482, 152 Fed. 98."

"*Specific Performance of Executory Contract and Foreclosure Contrasted*: An action for strict foreclosure is not in the nature of an attempt to enforce a forfeiture. It treats the contract as in full force and effect. The plaintiff offers to perform his covenant, and asks that the defendant be required to perform his, and it is only in case of failure to perform within a time to be fixed by the court that the plaintiff asks that the contract and the defendant's rights thereunder be foreclosed. In case the defendant comes in and pays up all amounts due, the contract remains in full force exactly as though there had never been any default in payment. Moter v. Hershey (1925) 48 S.D. 493, 205 N.W. 239."

Concerning another case under this heading it was said:

"A decree of strict foreclosure is very similar to a decree for the specific performance of a contract; it is in form that the defendant comply with his contract within a certain designated time by making payment of the balance due on the purchase price and executing the necessary security papers, if the contract calls for the same, under the penalty of forfeiting all right, title, and interest to and in the premises if he fails to comply with the decree. Foster v. Ley (1891) 32 Neb. 404, 15 L.R.A. 737, 49 N.W. 450; * * * In Clarke v. Curtis (1841) 11 Leigh (Va.) 559, 37 Am.Dec. 625, in a proceeding for the specific performance of the contract after the vendee had made default in paying the purchase price, it was held proper to decree a sale of the entire property, real and personal, covered by the contract, unless the vendee within a reasonable time, as designated by the court, paid the amount fixed by the decree. In this case there was a provision that in the event of a surplus

arising from the sale of the premises, it should be paid to the vendee."

"*Ordinary Foreclosure of Contract*: The view has been expressed that out of the nature of the relationship created by a land contract where the vendee is in possession, there have developed certain equitable remedies one of which is, in case of default of the vendee, that the vendor may sell out the interest of the vendee for the purpose of satisfying the former's lien under the contract, and, while it seems a misnomer, for convenience this remedy is spoken of as a foreclosure, and the action as one to foreclose the contract. Conners v. Winans (1924) 122 Misc. 824, 204 N.Y. S. 142."

It appears that nearly all states recognize ordinary foreclosure of the contracts for sale of real property.

"*Strict Foreclosure*" The editor of A. L.R. makes the following analysis on strict foreclosure:

"The original conception of a proceeding for the strict foreclosure of a contract for the sale of land was that as a matter of right it should and would result in a decree cutting off any and all interest of the vendee in the land. But, in instituting foreclosure proceedings, the vendor necessarily invoked an equitable remedy, with the consequent result of having the relief granted subject to any conditions being imposed which the interests of justice and equity might require. And this was particularly true as to the requirement of a sale of the land, an accounting of the proceeds thereof, and the allowance to the vendee of such a period for redemption as the equities of the case might require. Because of this modification of the rules as to granting a decree of strict foreclosure, the distinction between the ordinary foreclosure and a strict foreclosure has to a considerable extent disappeared, although the two classes of cases are separately considered herein."

Respondent in our case here contemplates the analysis made elsewhere by the A.L.R. editor:

"A decree of strict foreclosure has been designated a cancellation of the contract. Time is given the vendee in which to pay the balance of the purchase price, and if the allotted time expires without the money being paid, the contract is canceled by the decree of judgment of the court, and the vendor becomes again the owner of the estate."

Strict foreclosure under the common law has been modified by virtually all of the states to protect a vendee's interest as well as the vendor's. It is recognized

to be an action in the nature of specific performance which precedes foreclosure. In the absence of statutes dealing with land sale contracts many of the states apply statutes dealing with foreclosure of mortgages. In Idaho, those cases which mention strict foreclosure either dealt with a judicial sale of the premises, or as in Hagan v. Clyde, 60 Idaho 785, 97 P.2d 400, the Court sidestepped the question. See also, Walsh v. Coghlan, 33 Idaho 115, 190 P. 252; Mochel v. Cleveland, 51 Idaho 468, 5 P.2d 549. None of the cases foreclosed the vendee's interest without a sale or consideration of his equitable rights.

Mortgages and land sale contracts are discussed in American Law of Property, Vol. III, § 11.75, p. 188. Therein it is said with reference as to foreclosure:

"Decrees of strict foreclosure may very properly provide that the vendor deposit a deed with the court in escrow for the protection of the purchaser, thus making the action very similar to one for specific performance. Not but that in the event of payment by the purchaser and failure of the vendor to convey, the court, still having jurisdiction of the parties, would have ample power to effect the required transfer of the title. The matter of whether a tender of conveyance is a prerequisite to commencement of the action has been previously considered.

"But when it would be inequitable to grant a strict foreclosure, it appears to be within the inherent power of the court where fairness so dictates to decree instead that the vendee's interest be sold at judicial sale. The unfairness will not be to the vendor: if the value of the land has depreciated so that recovery of complete title to the land plus the payments received will not equal his sale price, he will have brought his action in the form of an ordinary foreclosure by sale if he desires an opportunity to secure a deficiency judgment. Any unfairness which will develop will be to the vendee by reason of the fact that prior to default he has paid a considerable portion of the purchase price or that the property has so enhanced in value that without a sale he will be unable to realize the profit to which his ownership would appear to entitle him. It is probably on account of these possibilities of injustice that the statutes of many states limit the scope of strict foreclosure of mortgages or prohibit that form entirely. However, in different jurisdictions these statutes are held to include or not to include land contracts. In normal times the danger of loss of the vendee's profit from increased value of the land is not great, in that he will be able to refinance his undertaking before the time of payment

limited by the decree has expired; but in times of economic depression, when refinancing is difficult or impossible, a grievous loss in this respect is very possible along with whatever he has paid on the purchase price, this latter being increasingly worse the later the depression catches up with him, perhaps after he has paid a major number of the installments, or erected substantial improvements, or heavily invested in the property in both particulars. The situation is the same when the vendor uses the statutory proceeding *in pais* for a strict foreclosure which is provided in some states, except that in addition to the burden he has as defendant in a judicial proceeding of proving facts which dictate that the foreclosure should be by judicial sale, he must himself start an action in order to bring the matter to the attention of a court. Aside from equity's recognized functions to relieve against forfeitures and penalties, his right to bring such an action appears to have statutory recognition in some states. However, vigorous complaint is made that the courts of several states refuse to recognize the situation as being other than one of enforcing valid, although onerous, terms of the contract made by the parties rather than a contract providing for forfeiture of rights as a penalty for non-performance."

In this case respondents requested the court to enforce the contract; this the court did and gave appellants 90 days within which to tender the balance payable under the contract, and upon appellants' failure so to do, decreed that the title to the property be quieted in respondents thereby to terminate all interests of appellants in the property.

This Court in actions involving land sale contracts has, in proper cases, required the vendors to make affirmative proof of damages to forestall injustice to vendees. Graves v. Cupic, 75 Idaho 451, 272 P.2d 1020.

On appeal this action was considered in the same light as in cases where the contract is terminated without the equities of the parties having been fully determined. In the original opinion the only item of damages mentioned by this Court was that of rental value of the premises, but it was not intended that a limitation be placed upon the respondents in submitting to the trial court proof of other damages, some of which may be peculiarly applicable to respondents. In this regard the court should hear and consider all evidence offered which tends to aid the court in weighing the equities of the parties.

Nor was it intended by the original opinion to limit the court's further consideration of this case to the hearing of proof of damages. It is also within the equity

power of the court to decree that the property be sold by judicial sale.

"Under those principles as recognized and adopted by the decisions of the courts of this and other states where a contract for the sale of realty is executory on both sides and the vendee has failed to make the payments required under the contract, the vendor, in case such relief is not inequitable, is entitled to a decree fixing a reasonable time in which the vendee will be required to pay the purchase price, and upon his failure to pay such price within the time limited, the vendee, without judicial sale, will be barred and foreclosed of his equitable estate in said property, whereupon the contract will be canceled and the vendee's rights thereunder will be terminated. If, however, the vendee has paid a considerable portion of the purchase price, or if the property has largely enhanced in value, or if, for any other reason, it would be inequitable to grant a strict foreclosure, it is within the inherent powers of a court of chancery, independent of statute, to decree that the property be sold by judicial sale, and that the proceeds of such sale, after the purchase price and the expenses of such sale have been paid, be paid over to the vendee or to those entitled thereto." Sheehan v. McKinstry, 105 Or. 473, 210 P. 167,

34 A.L.R. 1315; 92 C.J.S. Vendor & Purchaser § 463c, p. 429; 55 Am.Jur. 859, § 454.

Since this case is not governed by statute, but is one that is controlled entirely by equitable principles, the court in its wisdom may deem it proper and equitable to direct a judicial sale of the property involved.

II. Respondents complain that the court does not state the true facts in the opinion of the case in chief, "in that it did not refer to the findings of the District Court sustaining Respondents' right to a strict foreclosure of the contract." The findings of fact do no more than recite appellants' failure to make contract payments, to pay for insurance and taxes; also that certain notices were served promptly upon appellants' noncompliance with the contract. Respondents at their option had declared all sums due under the contract in addition to those sums in arrears. By such demand they laid the ground work of their claim for strict foreclosure, thereby seeking appellants' performance of the contract, or absent performance, to regain possession of the property under a decree of strict foreclosure. Respondents' claim did not contemplate a sale of the property; they secured a judgment which returned the property and foreclosed appellants' rights in any equities which may have existed in excess of respondents' damages.

**500**

Without extensive discussion of this subject our opinion stated "Appellants also assign error on part of the trial court in that a forfeiture as provided in the judgment of the amounts already paid is an unconscionable penalty." We then apply the equitable rule when it is said "Our rule pertaining to contract provisions for liquidated damages required that they be in a reasonable relation to the actual damages." It is also said, "Appellants are asking for an equitable determination of the relation between moneys paid in and damages actually suffered by the respondents." We referred only to Conclusions of Law made by the court, applicable to the case on appeal with reference to forfeiture at trial court level of all sums paid by appellants.

III. Respondents make a play on words when they next assert that this "Court mistakenly assumed that Respondents had terminated the contract involved herein and were attempting to retain, as liquidated damages, amounts theretofore paid by Appellants on the contract." We stated that appellants sought to foreclose the contract and that such claim could be more aptly referred to as one for specific performance. It was not said that the moneys paid were retained as liquidated damages, but that the rule in those appropriate cases is applicable.

Other errors complained of are discussed herein without being specifically mentioned. They are:

"IV. That the Court inadvertently, and because of a mistake in the statement of facts, overlooked controlling and decisive earlier decisions of the Idaho Supreme Court supporting a respondent's right to foreclosure of the contract involved in this case."

"V. That the Court, because of a mistake as to the facts in this case, held that Respondents were attempting to recover damages for breach of contract, whereas the facts are that Respondents were not attempting to recover, or retain damages for breach of contract, but were attempting to enforce the terms of the contract, which had never been terminated."

"VI. That the Court inadvertently, and because of a mistake as to the facts of the case, failed to pass upon the actual judgment made by the District Court, and authorities cited in support of such judgment."

The petition for recall of the remittitur is denied.

SMITH, C. J., TAYLOR and KNUDSON, JJ., and NORRIS, District Judge, concur.